309 Ga. 687
FINAL COPY

S20A0632.   PEREZ v. THE STATE.

ELLINGTON, Justice.

A Cobb County jury found Jesus Perez guilty of malice murder, armed robbery, and concealing the death of another in connection with the bludgeoning death of Boydrick Powell.[1] Perez appeals from the order denying his motion for a new trial, challenging the

---

[1] On March 31, 2011, a Cobb County grand jury indicted Perez and Jose Badillo for malice murder, two counts of felony murder, armed robbery, aggravated assault, and concealing the death of another. Perez was tried separately from March 18 to 22, 2013, and the jury returned a verdict of guilty on each count. On March 27, 2013, the trial court sentenced Perez to life in prison for malice murder, to a consecutive 20-year prison term for armed robbery, and to a ten-year prison term (concurrent with the armed robbery sentence) for concealing the death of another. The felony murder counts were vacated by operation of law, and the aggravated assault count merged with the malice murder count. Perez filed a motion for a new trial on April 9, 2013, which he subsequently amended. Because the original motion for a new trial was filed under the wrong case number, the State moved to dismiss the motion as untimely. The State's request was granted, and the motion for a new trial was dismissed on March 25, 2019. On April 4, 2019, Perez refiled his motion for a new trial under the correct case number after the trial court granted Perez's request for leave to file an out-of-time motion for a new trial. See *Washington v. State*, 276 Ga. 655, 656 (1) (581 SE2d 518) (2003). The trial court held a hearing on the motion on June 25, 2019, and entered an order denying the motion on August 15, 2019. Perez filed a notice of appeal to this Court on August 19, 2019. This case was docketed to this Court's April 2020 term and was submitted for a decision on the briefs.

sufficiency of the evidence supporting his convictions. Perez also contends that the trial court erred in admitting into evidence his custodial statement and the pre-autopsy photographs of Powell's injuries and in allowing the prosecutor to discuss the law of conspiracy during closing argument. As explained below, we affirm.

1. Perez contends that his convictions for malice murder, armed robbery, and concealing the death of another must be reversed because the evidence was insufficient to prove beyond a reasonable doubt that he was a party to those crimes. Perez argues that he did not share in the plan to rob and murder Powell and that, because he was under the influence of crack cocaine, he could not form the requisite criminal intent to commit those crimes. He also argues that he was coerced into participating in the crimes of armed robbery and concealing the death of another, and the trial court therefore should have directed a verdict in his favor. For the reasons that follow, we find these claims to be without merit.

In considering Perez's challenge to the sufficiency of the evidence, our review is limited to whether the trial evidence, when

viewed in the light most favorable to the verdicts, is sufficient to authorize a rational trier of fact to find the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted. See *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979). This same standard applies when evaluating the denial of a defendant's motion for directed verdict. See *Lewis v. State*, 296 Ga. 259, 261 (3) (765 SE2d 911) (2014). "Under this review, we must put aside any questions about conflicting evidence, the credibility of witnesses, or the weight of the evidence, leaving the resolution of such things to the discretion of the trier of fact." *Mims v. State*, 304 Ga. 851, 853 (1) (a) (823 SE2d 325) (2019) (citation and punctuation omitted). So viewed, the evidence presented at trial showed the following.

On September 17, 2010, Perez was visiting Jose Badillo in Badillo's apartment in the Autumn View complex in Cobb County. According to Perez, the two decided that they wanted some crack cocaine, so they called their drug dealer, Powell, who came to the apartment and sold them a bag of the drugs for $50. Later, as Perez

and Badillo smoked the crack cocaine, they concluded that Powell had not given them their money's worth. They decided to call Powell back to the apartment, hit him when he entered, demand the cocaine that they believed they were owed, and, if Powell refused, take what he had by force. Badillo called Powell several times, and Powell eventually returned to the apartment.

A friend of Powell's testified that, on September 18, just after midnight, he dropped Powell off at the Autumn View apartment complex, waited for a while, and drove away when Powell did not return. He testified that Powell had around $2,000 in his pockets. According to Perez, when Powell arrived at the apartment, Perez opened the door for him. As soon as Powell stepped into the apartment, Badillo, who had been hiding behind the door, hit Powell in the head with a bat. When Powell fell to the floor, Perez climbed over him, pressing him down. As Badillo beat Powell unconscious, Perez took money from Powell's pockets. Badillo continued to strike Powell in the head with the bat, killing him.

While the assault was occurring, Badillo's roommate, Jose

Rivera, opened his bedroom door and peered out. Rivera testified that he had heard a "crushing" sound and that his dog had growled. From his doorway, Rivera could see the assault occurring in the living room. He testified that he saw Perez "on top of a black guy, and [Badillo] was hitting the black guy with a bat." According to Rivera, Perez had positioned himself on Powell's feet and was rifling through Powell's pockets.

Rivera testified that he walked into the living room and confronted Badillo about what he and Perez had done, complaining that they would get him into trouble. Rivera was upset that they had used his dog's blanket to wrap Powell's bloody head. Badillo told him not to worry about it because he and Perez would clean up. During the argument, Perez said nothing. Rivera testified that, given what he had just witnessed, he retreated to his bedroom, worried that Badillo might hit him with the bat as well. After Rivera returned to his room, Badillo and Perez dragged Powell's body to the apartment's second-floor balcony and dropped it over the railing to the ground below. Powell's body landed in the back of the complex

behind an air conditioning unit. Rivera testified that he heard a "dull thud," like "something falling" outside the apartment. When Rivera ventured back into the living room, Powell's body was gone, and Perez and Badillo had left the apartment.

After dropping Powell's body from the balcony, Perez and Badillo went to Badillo's brother's apartment in the neighboring building. There, they discarded their bloody clothes and changed into clean clothes. Perez parted ways with Badillo and went to a hotel. Shortly thereafter, Perez bought a truck for $250 in cash and began driving to Colorado. Badillo returned to the apartment to clean it up. Rivera noticed that Badillo had bathed and changed clothes. Badillo offered to pay Rivera if he helped cover up the crime. When Rivera refused, Badillo threatened to kill him if he said anything. Instead of cleaning up, Badillo left the apartment and did not return. At the time of Perez's trial, Badillo had yet to be found. Rivera later identified Perez and Badillo from photographs, and he identified Perez at trial.

After Badillo left the apartment, Rivera called the police and

reported the crime. When the police arrived and entered the apartment, they observed a large amount of blood pooled on the living room floor and blood spatter on the walls and ceiling. The police followed a trail of smeared blood from the living room to the balcony. They found a bloody shoe print on the balcony floor and blood on the balcony railing, directly above where Powell's body had fallen. The police found Powell's body behind the apartment building, wedged between an air conditioning unit and a concrete patio. He had severe wounds to his face and head. When the police opened Powell's wallet, they found identification cards and photographs, but no money.

The police recovered a glass crack pipe and other drug paraphernalia from Badillo's apartment. They also found a baseball bat covered with Powell's blood. Underneath the kitchen sink, they found a bloody blanket. Later that day, officers executed a search warrant on the apartment belonging to Badillo's brother. In one of the bedrooms, they found blood-stained clothing and a pair of bloody shoes. Officers also found two pairs of blood-stained shorts in the

kitchen garbage. Hidden beneath the bathroom sink, they found a cell phone that was later identified as Powell's.

The medical examiner testified that Powell died of blunt-force trauma to the head. He noted that, although Powell had at least seven severe head wounds, he had no abrasions or contusions on his hands or upper body that would suggest he had tried to defend himself. He testified that Powell's injuries were consistent with his having been struck from behind while he was standing up, looking to his left. Further, based on an analysis of Powell's injuries and the blood spatter evidence, the remaining blows were likely delivered after Powell had fallen to the floor.

When Perez was taken into custody, he gave a custodial statement with the assistance of a police officer who spoke Spanish fluently. Perez admitted that he and Badillo believed that Powell had cheated them. He admitted that they planned to lure Powell back to the apartment, where they would hit him and force him to give them the drugs they were owed. Perez said Badillo did not force him to participate in the crimes. He admitted that he took money

from Powell's pockets, split it with Badillo, and then helped him drop the body from the balcony. Perez also told the police that the shoes he was wearing during the interview were the same shoes that he wore on the day of the murder. Following that admission, the officers took Perez's shoes for testing, and Powell's blood was found on the left shoe.

As summarized above, the evidence was sufficient to prove beyond a reasonable doubt that Perez was a willing participant in the crimes of which he was convicted. Although Perez complains that he was under the influence of cocaine at the time of the crimes, his voluntary intoxication provides no defense under these circumstances. See OCGA § 16-3-4 (c).[2] Further, although he argued

---

[2] It has long been the law in Georgia that
"[v]oluntary intoxication shall not be an excuse for any criminal act or omission," OCGA § 16-3-4 (c), except in the extreme situation where the intoxication "has resulted in the alteration of brain function so as to negate intent," and "[e]ven then, the brain function alteration must be more than temporary," *Horton v. State*, 258 Ga. 489, 491 (371 SE2d 384) (1988). See *Bright v. State*, 265 Ga. 265, 273-274 (455 SE2d 37) (1995) (viable voluntary intoxication defense requires evidence of "permanent brain function alteration").
*Guyse v. State*, 286 Ga. 574, 578 (2) (690 SE2d 406) (2010). Perez presented no evidence at trial that his brain function had been permanently altered.

at trial that Badillo coerced him into participating in the crimes, there was ample evidence to the contrary, including Perez's own prior admission that he was not coerced. Perez admitted that he and Badillo planned to lure Powell to the apartment, hit him, and take drugs from him by force. Perez admitted that he took money from Powell's pockets as Badillo bludgeoned Powell with a baseball bat. Rivera witnessed Perez's participation in the armed robbery and violent assault that led to Powell's death. When Rivera complained to Badillo and Perez about what they had done, Perez said nothing. Perez also admitted participating in removing Powell's body from the apartment after Badillo had told Rivera that he and Perez would clean up the crime scene. Perez admitted splitting the money he took from Powell with Badillo before they fled. The forensic evidence was consistent with Rivera's testimony and Perez's admissions. This evidence was sufficient to authorize a rational jury to find Perez guilty beyond a reasonable doubt as a party to the crimes of malice murder, armed robbery, and concealing the death of another. See *Jackson*, 443 U. S. at 319 (III) (B). See also *Vega v. State*, 285 Ga.

32, 33 (1) (673 SE2d 223) (2009) ("It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence." (citation and punctuation omitted)); *Conaway v. State*, 277 Ga. 422, 423 (1) (589 SE2d 108) (2003) (concluding that the evidence supporting the appellant's convictions was legally sufficient, notwithstanding his testimony that he was coerced to commit the crimes, which "at most created a conflict with other evidence that showed his participation in the crimes was voluntary"). See also OCGA § 16-2-20 (defining parties to a crime); *Butts v. State*, 297 Ga. 766, 770 (2) (778 SE2d 205) (2015) (explaining that under OCGA § 16-2-20, a jury may infer a common criminal intent from the defendant's presence, companionship, and conduct with another perpetrator before, during, and after the crimes); *Cargill v. State*, 256 Ga. 252, 253 (1) (347 SE2d 559) (1986) (explaining that the evidence authorized a finding that the defendant was a party to the crime and that it thus did not matter whether the defendant or his accomplice inflicted the fatal injury because "[t]he act of one was the act of the other in the commission

of the armed robbery and the ensuing death which resulted therefrom") (citation and punctuation omitted).

2. Perez contends that the trial court erred in admitting into evidence his custodial statement because he did not knowingly and voluntarily waive his rights pursuant to *Miranda v. Arizona*, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966). He also contends that his statement was obtained in violation of OCGA § 24-8-824 ("To make a confession admissible, it shall have been made voluntarily, without being induced by another by the slightest hope of benefit or remotest fear of injury."). Specifically, Perez argues that his drug use, lack of education, and inability to speak or read the English language impaired his ability to communicate with the police. Further, the officer translating for him spoke a different dialect of Spanish.[3] He also contends that, during the interrogation, the police

---

[3] Perez has not argued in the trial court or on appeal that his due process rights were violated by the absence of a qualified interpreter. See *Ling v. State*, 288 Ga. 299, 302 (2) (702 SE2d 881) (2010) ("[W]hen a question is raised in a motion for new trial as to whether a criminal defendant's due process rights have been violated by the absence of a qualified interpreter, the trial court must make and explain its findings on the issue on the record.").

lied to him, yelled at him, intimidated him, and offered him a hope of benefit for his statement.

Prior to trial, the court held a *Jackson v. Denno*[4] hearing on Perez's motion to suppress his custodial statement. Two investigators (a detective and an officer who acted as the translator) testified at the hearing; the State introduced a signed *Miranda* waiver form that was in both English and Spanish; and the trial court reviewed the video recording of Perez's custodial interview. After the hearing, the trial court asked that an English-language transcript of the interrogation be produced and made a part of the record. After reviewing the entire record, the trial court determined that Perez had knowingly and voluntarily waived his *Miranda* rights and that his statement was voluntarily made without the slightest hope of benefit or remotest fear of injury. For the following reasons, we find no merit to this claim of error.

"The trial court determines the admissibility of a defendant's statement under the preponderance of the evidence standard

---

[4] 378 U. S. 368 (84 SCt 1774, 12 LE2d 908) (1964).

considering the totality of the circumstances." *Vergara v. State*, 283 Ga. 175, 176 (657 SE2d 863) (2008). "Although we defer to the trial court's findings of disputed facts, we review de novo the trial court's application of the law to the facts." *Clay v. State*, 290 Ga. 822, 823 (1) (725 SE2d 260) (2012). We "will not disturb the trial court's factual and credibility determinations unless they are clearly erroneous." *Wright v. State*, 285 Ga. 428, 432 (2) (677 SE2d 82) (2009). However, "'(w)here controlling facts are not in dispute, . . . such as those facts discernible from a videotape, our review is de novo.'" (Citation omitted.) *Vergara*, 283 Ga. at 178 (1).

The record shows that Perez's custodial interview began shortly after 9:00 p.m. on September 20, 2010, the day that Perez was arrested, and continued for about four-and-a-half hours. The investigators informed Perez in Spanish why they were questioning him. During the interview, Perez was given two 30-minute breaks, offered food and drink, allowed bathroom breaks, and permitted to sleep during one of the breaks.

The investigators testified that they found Perez to be

articulate, and they saw no indication that he was intoxicated. They believed he was able to communicate with them in Spanish and appeared to understand the questions posed to him. The *Miranda* form that Perez signed was in English and in Spanish. The officer, at the detective's request, translated the *Miranda* form to Perez and then discussed in detail each of the rights that Perez was waiving. He also asked whether Perez understood each of these rights, and Perez indicated that he did. Although the officer spoke a different dialect of Spanish, the officer testified that whenever he or Perez did not understand a word or a phrase, he would pause the interview to resolve any confusion. The detective testified that Perez was responsive to questions, appeared to be reading the *Miranda* form before he signed it, and was able to write in Spanish and to sign his name to the form. During the interview, Perez did not ask for an attorney, invoke his right to remain silent, or ask to stop the interview for any reason.

The investigators testified that they did not coerce or threaten Perez. Although the detective occasionally raised his voice to Perez,

both the detective and the officer testified that they did not believe they were being unusually confrontational. The trial court specifically found that the investigators did nothing that could be considered "unduly confrontational or untoward" during the interview, and the video recording of the interview supports that finding. Rather, the detective only raised his voice a few times to complain that he thought Perez was lying. The video recording also shows that the investigators, who were in plain clothes and unarmed, did not physically abuse or overtly intimidate Perez. Considering the totality of the circumstances, nothing in the video recording suggests "excessively lengthy interrogation, physical deprivation, brutality, or other such hallmarks of coercive police activity" that would render the resulting statement involuntary. (Citation and punctuation omitted.) *Drake v. State*, 296 Ga. 286, 291 (3) (766 SE2d 447) (2014).

The investigators also testified that they did not offer Perez the slightest hope of benefit or remotest fear of injury. Although the investigators told Perez that he could help himself by being honest

and by telling them what had really happened, such statements are not the equivalent of offering a hope of benefit under OCGA § 24-8-824. As we have explained:

> It has long been understood that "slightest hope of benefit" refers to promises related to reduced criminal punishment — a shorter sentence, lesser charges, or no charges at all. By contrast, this Court has explained that certain other tactics used by law enforcement — such as exhortations or encouragement to tell the truth, conveying the seriousness of the accused's situation, or offering to inform the district attorney about the accused's cooperation while making clear that only the district attorney can determine charges and plea deals — do not amount to a hope of benefit.

(Citations and punctuation omitted.) *Budhani v. State*, 306 Ga. 315, 325 (2) (b) (830 SE2d 195) (2019). See also OCGA § 24-8-824 (only voluntary confessions admissible). Finally, although the detective admittedly lied to Perez and strategically withheld and then disclosed information concerning the evidence against Perez during the course of the interview,

> the employment of trickery or deceit to obtain a confession does not render the resulting statement inadmissible so long as those tactics are not designed to procure an untrue statement and also do not amount to "a slightest hope of benefit or remotest fear of injury."

(Citations omitted.) *Price v. State*, 305 Ga. 608, 610 (2) (825 SE2d 178) (2019). Perez has not demonstrated (nor does the record show) that the investigators engaged in tactics that amounted to offering the requisite hope of benefit or fear of injury or which were designed to procure an untrue statement.

Because the evidence supports the trial court's conclusion that Perez was advised of his *Miranda* rights, understood them, voluntarily waived those rights, and thereafter gave his statement voluntarily and without any hope of benefit or fear of injury, it was not error for the trial court to admit the statement into evidence at trial.

3. Perez contends that the trial court erred in admitting into evidence five pre-autopsy photographs of Powell's body because the probative value of the photographs was substantially outweighed by their prejudicial impact. Specifically, Perez argues that the gruesome pictures of Powell's "murdered body" were unnecessary because Perez did not contest that Powell had been murdered. For

the following reasons, we see no abuse of discretion.

The admissibility of crime scene and victim injury and autopsy photographs is generally governed by OCGA § 24-4-401, which defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"; by OCGA § 24-4-402, which provides that "[a]ll relevant evidence shall be admissible, except as limited by constitutional requirements or as otherwise provided by law or by other rules"; and by OCGA § 24-4-403 ("Rule 403"), which provides that "[r]elevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." "Decisions regarding relevance are committed to the sound discretion of the trial court and the exclusion of relevant evidence under Rule 403 is an extraordinary remedy that should be used only sparingly." (Citations and punctuation omitted.)

*Venturino v. State*, 306 Ga. 391, 395 (2) (b) (830 SE2d 110) (2019) (discussing the admissibility of autopsy photographs).

The record shows that, after considering Perez's objections and the arguments of counsel and after excluding several redundant photographs, the trial court admitted in evidence five pre-autopsy photographs of Powell's head, torso, and hands. The medical examiner referred to the photographs when testifying concerning the lack of defensive wounds to Powell's hands and torso and the number and location of wounds to Powell's head. The State argued that the nature and location of Powell's injuries, as depicted in the photographs, were consistent with Powell having been struck from behind by Badillo. Powell's injuries were also consistent with Badillo having bludgeoned the left side of his head at least six more times after Powell fell to the floor. Additionally, the State argued that the jury could infer an intent to kill from the way Badillo focused his blows to Powell's head. The trial court agreed with these arguments, but nevertheless had the State redact portions of the photographs. The trial court concluded that, although the redacted photographs

still showed some blood, they were not overly gruesome nor unduly prejudicial. Moreover, because the State was using the photographs during its direct examination of the forensic pathologist to illustrate the manner and cause of Powell's death, the trial court concluded that their probative value outweighed any prejudice.

We discern no abuse of discretion in the admission of these photographs because any prejudice resulting from the depiction of Powell's wounds was outweighed by their probative value concerning the State's theory of how the killing occurred. See *Plez v. State*, 300 Ga. 505, 507-508 (3) (796 SE2d 704) (2017).

4. Perez contends that the trial court erred in allowing the prosecutor to argue the law of conspiracy culpability during closing argument (and to display the law on a screen for the jury to view), even though the court had declined to give such an instruction in its final charge to the jury. Perez argues that the law should come from the judge, not the attorneys. "Unquestionably, the jury is to receive the law from the court, not from counsel. However, counsel have every right to refer to applicable law in argument; it is law that the

court will *not* charge the jury that counsel is prohibited from presenting." (Citation omitted; emphasis in original.) *Kirkland v. State*, 271 Ga. 217, 219 (3) (518 SE2d 687) (2003).[5]

The record shows that, during the charge conference, the trial court declined to give the State's request to charge the jury on "conspiracy culpability" because Perez had not been indicted for the crime of conspiracy.[6] Nevertheless, the trial court said that it would allow the prosecutor to argue the law of conspiracy culpability because that law was similar to the law of parties to a crime and the

---

[5] In 1985, this Court extended its prohibition against "reading the law" to criminal cases. "Reading the law" was a practice in which attorneys, during their closing arguments and in the presence of the jury, informed the trial court of the legal authorities upon which they were relying, ostensibly to inform the court of the applicable law and to assist the court in the preparation of its final charge to the jury. The underlying rationale for this practice ended when OCGA § 5-5-24 (b) was enacted, which requires counsel to submit their requests to charge at or before the close of the evidence and requires the court to inform counsel of its proposed action on the requests prior to counsel's argument to the jury. See *Conklin v. State*, 254 Ga. 558, 569-571 (10) (331 SE2d 532) (1985). This Court concluded, therefore, that no justification remained "for allowing an attorney to supplement the court's charge by reading, in the jury's presence, law that the court [was] not going to charge." Id. at 571 (10) (b).

[6] The prosecutor requested a charge that contained language excerpted from the pattern jury instruction for conspiracy culpability: "When persons associate themselves in an unlawful enterprise, any act done by any party to the conspiracy to further the unlawful enterprise is considered to be the act of all the conspirators." Suggested Pattern Jury Instructions, Vol. II: Criminal Cases § 2.02.20 (4th ed. 2020).

evidence tended to support an argument that Perez and Badillo had entered into an agreement to rob and beat Powell. During its final charge, the trial court gave an instruction on parties to a crime that included the following language: "Presence, companionship, and conduct before and after the commission of the alleged offense may be considered by you in determining whether or not such circumstances, if any, give rise to an inference of the existence of a conspiracy."

The record also shows that, during that portion of his closing argument addressing the law concerning parties to a crime, the prosecutor discussed conspiracy culpability. As he spoke, the prosecutor displayed the text of the law concerning conspiracy culpability on a screen for the jury to view.[7] He argued: "Any act done by a party is an act of all. That's the rule. Any act done by any

---

[7] In *Kirkland*, we stated that there was no harm in counsel using visual aids that included the text of expected legal instructions during closing argument so long as they did not misstate or differ from those given by the court in its final charge. See 271 Ga. at 219 (3). In this case, it is not clear from the record exactly what legal text — e.g., statute, definition, or pattern charge — was displayed to the jury. In any event, Perez does not contend on appeal that the law displayed or argued was incorrect, misleading, or inapplicable.

party is an act of all. That's conspiracy culpability, and it sounds just like parties to a crime. Sounds very similar doesn't it." At this point, Perez's counsel objected, and a bench conference was held outside the presence of the jury. Counsel argued: "I think [the prosecutor] was given leave to argue that they are conspirators, that they made an agreement, but the law that he's putting on there is not law that's applicable to this case, so I object to this." The trial court overruled the objection, noting that counsel had not objected when the trial court expressly allowed the prosecutor to argue the law of conspiracy culpability:

> I didn't hear an objection to him being allowed to argue conspiracy in this way. I said I would not charge the jury on the conspiracy. You certainly can argue that the Court is not going to be charging on a conspiracy and that it's not in the indictment as a conspiracy, but I think it's appropriate under the parties to the crime for him to argue that a conspiracy is essentially the same as being a party to the crime, so I'll overrule the objection. I will allow him to argue it.

Pretermitting whether the trial court's ruling was error, any error was harmless. Both the prosecutor and the trial court informed the jury that it was bound by the law as given in the court's

instructions, not the law as argued by the attorneys. Further, Perez has not demonstrated that the law argued and displayed by the prosecutor was incorrect, misleading, or inapplicable. In fact, under the circumstances of this case, the trial court would have been authorized to give a conspiracy charge because the evidence supported it. See *Pyatt v. State*, 298 Ga. 742, 749 (4) (784 SE2d 759) (2016) (It is not error to charge on the subject of conspiracy, even if not indicted, when slight evidence tends to show a conspiracy.). See also *Guyton v. State*, 281 Ga. 789, 791 (3) (642 SE2d 67) (2007); *Mangum v. State*, 274 Ga. 573, 578 (3) (d) (555 SE2d 451) (2001). Additionally, the trial court's charge concerning parties to a crime used the word "conspiracy." We note that there is nothing in the record to indicate that the prosecutor's definition of "conspiracy" nor his argument concerning conspiracy culpability was incorrect, misleading, or inapplicable under the circumstances of this case. Finally, the evidence against Perez was overwhelming, and it is highly probable that error, if any, did not contribute to the verdict. See *Kirkland*, 271 Ga. at 219-220 (3) (finding no harmful error where

the court informed the jury that instruction on the law was to come from the court and where the evidence of the defendant's guilt was overwhelming).

*Judgment affirmed. All the Justices concur, except Peterson, J., not participating.*

Decided September 8, 2020.

Murder. Cobb Superior Court. Before Judge Kell.
*Richard M. Craven II*, for appellant.
*Joyette M. Holmes, District Attorney, Amelia G. Pray, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Meghan H. Hill, Assistant Attorney General*, for appellee.