316 Ga. 363
FINAL COPY

S23A0210. McCALOP v. THE STATE.

LaGrua, Justice.

Appellant Sasha McCalop was convicted of malice murder in connection with the stabbing death of Michael Martin, her boyfriend of three years.[1] On appeal, McCalop contends that (1) the trial court erred in allowing the State's expert to comment on McCalop's state of mind, (2) the trial court erred in allowing the State's expert to testify because he had never testified in Georgia before and was not familiar with Georgia law on battered person syndrome ("BPS"), (3) the trial court erred in allowing the State's expert to testify that BPS

---

[1] Martin died on January 17, 2018. On April 21, 2018, a DeKalb County grand jury indicted McCalop for malice murder, felony murder, and two counts of aggravated assault. At a trial in March 2019, the jury found McCalop guilty of all counts. The trial court sentenced McCalop to serve life in prison with the possibility of parole for malice murder; the remaining counts merged or were vacated by operation of law. McCalop filed a timely motion for new trial, which was amended through new counsel. After a hearing, the trial court denied the motion for new trial on August 4, 2022. McCalop filed a timely notice of appeal, and her appeal was docketed to this Court's term beginning in December 2022. The case was orally argued on February 9, 2023.

had no scientific basis and that trial courts were wrong in providing jury instructions on BPS, (4) the State committed prosecutorial misconduct by arguing to the jury that BPS was not a recognized diagnosis or defense, and (5) the trial court erred in ruling that a defense witness "opened the door" to presenting evidence of McCalop's bad character. Seeing no error, we affirm.

The evidence presented at trial showed that in late 2015, McCalop and Martin began dating, and their relationship quickly devolved into a tumultuous one. Between April 2016 and October 2017, the couple was involved in four police-reported incidents of domestic violence, comprised of the following.

In April 2016, McCalop called 911, gave her address to the 911 operator, and was then heard yelling, "Give me my phone." The phone call then disconnected on McCalop's end. The police officer who responded to the call described McCalop as "very upset and crying," with a swollen face and slight bruising to her face. McCalop told the officer that Martin punched her after a dispute. The officer looked for Martin, but did not locate him.

In December 2016, McCalop called 911 and stated that she got into an argument with her boyfriend—he "swung on [her]," they got into a "scuffle," and she "bit him." The police officer who responded to the call observed "a red mark" on McCalop's neck, but he was not sure "if it was a fresh red mark or an old one." While the officer could not recall the exact details of what McCalop said occurred with Martin, he testified that the mark on McCalop's neck was not consistent with her version of events. Martin was not present when the officer arrived, and he could not remember whether he looked for Martin.

In May 2017, police were dispatched following a 911 call from a male caller. Upon arriving at the address given by the caller, a police officer met with McCalop, who stated that Martin called 911 because their verbal dispute became a physical one. McCalop stated that Martin threw her into a dresser and repeatedly punched her in the face. The officer did not observe any visible injuries consistent with McCalop's version of events as she had only "a small laceration" between her thumb and index finger. While the officer was speaking

3

to McCalop, Martin arrived. Martin was "bleeding pretty bad" from a cut in his neck, and he had a cut on his arm. Martin stated that McCalop had grabbed a box cutter and swung at him. Martin was transported to Grady Hospital, and McCalop was arrested for aggravated assault.

In October 2017, police were dispatched to a package store following a 911 call from a male caller named "Michael," who stated his girlfriend had a knife and that he had injuries to his face and leg. When police arrived, Martin told an officer that McCalop stabbed him in the leg. The officer observed blood on Martin's pants and "th[ought] he had a laceration on his face.". The paramedics attempted to treat Martin, but he ran into a nearby house and refused to open the door, which ended police involvement.

Regarding the tenor of the relationship between McCalop and Martin, a neighbor testified that she heard the couple constantly arguing. McCalop's father and stepmother testified that their relationship with McCalop had become "distant" since she began dating Martin. Seven of McCalop's friends and family members

4

testified that, during the time that McCalop was dating Martin, they witnessed visible injuries to McCalop, including bruises, bite marks, and black eyes. On one occasion, McCalop's friend picked her up from Atlanta Medical Center, and McCalop "had a busted head that was wrapped up." However, none of McCalop's friends and family members ever saw Martin make physical contact with McCalop. But Martin's sister recalled an incident when McCalop "slapped [Martin] across his neck" without provocation, and on another occasion, another family member witnessed McCalop throw Martin's pack of cigarettes into the woods, stating, "Well, you ain't got the money that I need, I ought to bust your damn head."

In late December 2017, McCalop stayed with her family for the Christmas holidays, and in early January, she went back to the rooming house where she and Martin shared a room. McCalop's stepmother testified that McCalop called her on or about January 13, 2018, and McCalop was "upset" and "saying something about what was—what was going on with her and [Martin]." McCalop's stepmother testified that she told McCalop: "I thought I asked you

5

not to be with him. It's . . . too dangerous for you and I just can't do this anymore." After the phone call ended, McCalop's stepmother suspended service to McCalop's cell phone. The stepmother testified that McCalop was not welcome back in her home because the stepmother had "other kids" and "believed that [McCalop] was in a dangerous situation and [the stepmother] couldn't afford for that to come to [her] house."

Several days later, in the early morning hours of January 17, Jasmine Jones, another resident of the rooming house, woke up and heard Martin yelling and "cussing" and "glass being shattered across the wall." She did not hear anyone else yelling, and she eventually went back to sleep. While Jones was asleep, her boyfriend heard a woman screaming, and it "sounded like [a man] was being aggressive toward[] her." But then, about 15 minutes later, Jones's boyfriend heard "the [man] in distress instead of the woman in distress." Based on their voices, Jones's boyfriend believed the people he heard were Martin "and his girlfriend."

Later that same morning, Jones woke up and heard Martin

yelling, and "it sounded like he was tussling" for several minutes. She then heard Martin say: "No, no, no, no. Why are you doing this to me?" Jones's boyfriend also woke up around this time and heard a man repeatedly saying, "Oh, my God." Both Jones and her boyfriend then heard a door slam.

At 5:39 a.m., Martin called 911 to report "a domestic dispute" and gave his address. The 911 operator asked what happened, and he stated, "I got a female that used to be my old lady that can't seem to listen to what I say," followed by something unintelligible about it being 20 degrees outside. The 911 operator asked if there were any weapons involved, and Martin responded that there were "a lot of kni[v]es around here." About a minute into the call, and at the request of the 911 operator, Martin repeated his name, address, and phone number. During this portion of the 911 call, the voice of someone else could be heard faintly in the background. After repeating Martin's contact information back to him, the 911 operator stated that someone would be dispatched as soon as possible. Martin then yelled in distress, "Oh, my god," "Stop that,"

7

and "What the hell is wrong with you?" After over a minute of audible distress, Martin went silent. A person could be heard faintly in the background of the call, followed by a door slamming. A minute later, Martin was heard groaning, but he did not respond to the 911 operator. After another minute of silence, the phone call disconnected. Police responded to Martin's address, where he was found deceased near the front door of the rooming house. Police officers followed a trail of blood in the snow to a nearby shed, where McCalop was located and arrested.

The medical examiner testified that Martin had "sharp-force injuries" to both hands, which were likely caused by "something that ha[d] an edge to it," e.g., a knife, piece of glass, or razor blade, and that these injuries were consistent with defensive injuries. Martin also had a superficial cut on the right side of his back. The medical examiner determined that Martin's fatal injury was a stab wound of his right thigh, which severed the femoral artery and caused him to bleed to death. Martin's toxicology report showed "a significant amount of alcohol in his blood," as well as "free cocaine" and

cocaethylene, a compound that is created by the bodies of certain people when they consume both alcohol and cocaine.

After McCalop was arrested, she agreed to give a statement to police. During her police interview, McCalop stated she had a "domestic dispute [with Martin]. . . that escalated." She explained that Martin was a "downer" and "very abusive" and talked to her "like [she was] crap." McCalop further stated that on the night of the incident, Martin had confessed that, during his relationship with McCalop, he had been sleeping with the mother of his brother's child. McCalop yelled at him for this transgression, and he responded, "B**ch, you need to get the f**k up out my room." After a moment, McCalop asked to borrow Martin's cell phone because he had recently broken her cell phone. Martin, who was lying in their bed, responded, "You can have anything I got, baby, just come, all I want is you." As McCalop was getting into bed, Martin "flipped" and said: "B**ch, what are you doing? Get the f**k out my bed." Martin then grabbed McCalop and began choking her. McCalop attempted to leave, but Martin would not let her, and they fought. McCalop

9

stated she eventually broke free, ran out of the house, and hid in a neighbor's shed. During this portion of the interview, McCalop did not mention any weapons.

The detective then asked McCalop why blood was on her clothes, and she stated she was not sure and did not know whether it was her blood or Martin's blood. When asked why she thought it might be Martin's blood, McCalop said, "Because we were scuffling in the house . . . [and] I was not going to allow him to keep having me captive in that house like he always do[es]."

McCalop then expanded her initial version of events. She stated that Martin's friend, June, was present earlier in the evening. June had told McCalop that Martin had a problem with the fact that, during a recent break in their relationship, McCalop had slept with the father of her best friend's child. After June left, Martin started yelling at McCalop for her transgression. It was during this argument that Martin admitted to sleeping with the mother of his brother's child. McCalop then told Martin, "You're nothing but s**t" and pointed to a lapel pin with a depiction of a "s**t emoji," saying:

"This is you. You're a s**t emoji." After Martin yelled at McCalop, she asked to borrow his cell phone, and Martin responded, "You can have anything I got, baby, all I want is you." As McCalop prepared to get into the bed, Martin started kicking her, yelling, "B**ch, get the f**k out my room." Martin then jumped up, and they started fighting in the bedroom and wound up in the living room of the rooming house. McCalop then decided she was going to leave Martin, so she left the house, and Martin closed the door behind her. McCalop denied "stick[ing] him" with anything.

About 20 minutes into the interview, McCalop asked the detectives, "What's wrong?" and one of the detectives responded that Martin was dead. McCalop reacted with audible distress. After a short break, the interview resumed. McCalop stated she ran out of the house because they were fighting and she did not "want to get beat up anymore." When asked again why there was blood on her clothes, she merely said they fought and did "not remember pulling out anything." McCalop repeated that when she ran out of the house, Martin yelled, "F**k you, b**ch," and closed the front door. McCalop

11

stated that after Martin initially kicked her in the bedroom, he said, "Oh, I know how to get you out of here," and then he called 911. But McCalop stated she was not sure if Martin had really called 911 because he had previously pretended to call 911 on a separate occasion.

One of the detectives then confronted McCalop about omissions in her version of events and asked: "But you're leaving out a very important part right now. What is it?" McCalop responded, "Did I pull a knife out on Michael Martin?" The detective asked, "Did you?" and she responded, "I did." When asked whether she used the knife, she responded, "I had it in my hand trying to get out of the house with no intention[] on using it." McCalop explained that she had the knife in her hand when the fight started, but she did not swing at Martin with the knife. Rather, she managed to get free and run out of the house. Martin then yelled, "F**k you, b**ch," and McCalop walked to the neighbor's shed.

When McCalop was asked why she had a knife in her hand, she stated: "Because when he came at me that was my only defense. He

beats me all the time. And I remember when I cut him the first time, he left me alone." McCalop then appeared to recount portions of the May 2017 and October 2017 police-reported incidents of domestic violence. McCalop then stated that when Martin threatened to call 911, she told him to do it. But she thought he was pretending to call 911. She further stated that while Martin was allegedly on the phone with the 911 operator, he laid his cell phone down and grabbed McCalop. In response, she grabbed a nearby kitchen knife and yelled, "Let me go, just let me go." When she finally left the house, Martin yelled, "F**k you, b**ch." McCalop had no memory of why there was blood on her clothes.

McCalop testified at trial, and her testimony was somewhat consistent with the last version of events that she gave to the detectives. Although she never actually admitted to swinging a knife at Martin during her police interview, she admitted at trial that she swung a knife at Martin when he attempted to prevent her from leaving the house.

McCalop presented expert testimony from Dr. Marti Loring,

who was qualified as an expert in post-traumatic stress disorder ("PTSD"), BPS, and trauma. Dr. Loring testified that McCalop had symptoms of PTSD and BPS and that traumatized people often have a fragmented memory. In rebuttal, the State called Dr. John Hamel, who was qualified as an expert in the "area of domestic violence." Dr. Hamel testified that he "agree[d] with Dr. Loring in most respects," "th[ought] Dr. Loring . . . seemed to have done a very thorough investigation," and "[did not] really disagree with [Dr. Loring's] diagnosis of [McCalop with] PTSD," but stated PTSD did not explain McCalop's behavior on the night Martin died or the "contradictions" in her statement to police.

1. McCalop contends that the trial court erred in allowing Dr. Hamel to testify about McCalop's "state of mind" because Dr. Hamel did not interview or evaluate McCalop and thus he could not establish a "valid factual basis" for any of his opinions. Assuming without deciding that this claim was preserved for ordinary appellate review, this claim fails.

After the defense rested, the State called Dr. Hamel in

14

rebuttal. McCalop objected to Dr. Hamel testifying about McCalop's state of mind because Dr. Hamel never interviewed her. The trial court agreed with the State that Dr. Hamel could not provide an opinion on the ultimate issue, i.e., whether McCalop was legally justified in stabbing Martin, but he could provide an opinion, based on his review of the evidence, about whether McCalop's behavior was consistent with BPS. The trial court then overruled McCalop's objection. After a voir dire of Dr. Hamel's qualifications, he was admitted as an expert and proceeded to testify.

McCalop contends that Dr. Hamel was permitted, over objection, to testify that McCalop was "malingering" and that the relationship of McCalop and Martin was "mutually abusive" and "dysfunctional." Specifically, Dr. Hamel testified as follows:

> Q: So you would say -- describe [the relationship between McCalop and Martin] as mutually abusive?
> A: Yes.
> Q: Okay. And what is attachment theory?
> A: Right. So Dr. Loring brought up the trauma bond. So yes, I think these two were bonded. Trauma bond is just when individuals who have both experienced trauma or one of them has experienced trauma [and] pairs up with someone in a dysfunctional relationship.

15

. . .

A: And so as I look at -- if I -- as I was thinking about this case and thinking about the interaction between these two, it seemed to me pretty obvious, based on my -- my experience, that while [McCalop] clearly has PTSD, they -- this was a mutually violent relationship where both parties, it seemed to me, are acting out these attachment insecurities.

. . .

Q: And so if Dr. Loring determined that when she interviewed Ms. McCalop, that she wasn't malingering, you don't disagree with her findings.
A: No. That's part of the whole picture, right?
Q: Okay.
A: I don't disagree -- I don't completely disagree. I think -- I think there was malingering. Based on the police interviews, I think she was misleading the police. But that doesn't mean that Dr. Loring's test results were invalid. It's just a part of the puzzle, you know, altogether. You judge all the pieces together.

The crux of McCalop's contention appears to be that Dr. Hamel "comment[ed] on [McCalop's] state of mind" even though he "had no valid factual basis" for these opinions. To the extent that McCalop contends that the complained-of portions of Dr. Hamel's testimony were inadmissible because they were not based on personal knowledge, i.e., Dr. Hamel did not evaluate McCalop, such claim has

16

no merit. OCGA § 24-7-703 ("Rule 703")[2] permits an expert to express opinions based on facts of which he does not have personal knowledge. See *Smith v. State*, 307 Ga. 106, 118-119 (6) (834 SE2d 750) (2019) (noting that the rule that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of such matter" applies only to "lay persons," not experts).

Additionally, the testimony that McCalop complains of—i.e., that McCalop was "malingering" during her interview with police and that the relationship of McCalop and Martin was "mutually abusive" and "dysfunctional"—was not impermissible "state of mind" testimony going to the ultimate issue.

OCGA § 24-7-704 (b) provides:

No expert witness testifying with respect to the mental state or condition of an accused in a criminal proceeding

---

[2] Rule 703 provides in part:
The facts or data in the particular proceeding upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, such facts or data need not be admissible in evidence in order for the opinion or inference to be admitted.

17

shall state an opinion or inference as to whether the accused did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone.

"An expert testifies 'with respect to' the mental state or condition of a defendant when an inference of the facts testified to is that the defendant had the mental state or condition constituting an element of the crime." *Wade v. State*, 304 Ga. 5, 11 (4) (815 SE2d 875) (2018) (citation and punctuation omitted).

Here, Dr. Hamel's testimony did not implicate McCalop's mental state at the time she used a knife—either offensively or defensively—against Martin. Rather, Dr. Hamel's testimony addressed the general condition of McCalop's and Martin's relationship and whether McCalop misled police during her interview. Thus, the complained-of portions of Dr. Hamel's testimony were not impermissible "state of mind" testimony pursuant to OCGA § 24-7-704 (b).

For these reasons, McCalop has not shown any error in permitting Dr. Hamel to testify that McCalop was "malingering"

18

during her interview with police and that the relationship of McCalop and Martin was "mutually abusive" and "dysfunctional." Thus, this claim fails.

2. McCalop contends the trial court erred in allowing Dr. Hamel to testify because he was not familiar with Georgia law on BPS and had never testified in Georgia before. This contention fails.

During McCalop's voir dire of Dr. Hamel's qualifications, Dr. Hamel testified that he had never testified in Georgia before and had not reviewed Georgia law on BPS. McCalop's trial counsel objected to Dr. Hamel being qualified as an expert in domestic violence, and the trial court overruled this objection.

During McCalop's trial, former OCGA § 24-7-707 ("Rule 707")[3] was in effect and provided: "In criminal proceedings, the opinions of experts on any question of science, skill, trade, or like questions shall always be admissible; and such opinions may be given on the facts

---

[3] "The General Assembly recently has amended the Evidence Code, however, to extend to criminal cases the federal standard of admissibility of expert testimony articulated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (113 SCt 2786, 125 LE2d 469) (1993), and its progeny." *Smith v. State*, 315 Ga. 287, 300 (2) (b) n.6 (882 SE2d 300) (2022).

19

as proved by other witnesses." Under former Rule 707, "the opinions of experts on any question of science were generally admissible in criminal cases." *Smith v. State*, 315 Ga. 287, 300 n.6 (2) (b) (882 SE2d 300) (2022) (citation and punctuation omitted). And

> [t]o qualify as an expert generally *all that is required* is that a person must have been educated in a particular skill or profession; his special knowledge may be derived from experience as well as study. Formal education in the subject at hand is not a prerequisite for expert status. The trial court has broad discretion in accepting or rejecting the qualifications of the expert, and its judgment will not be disturbed on appeal absent an abuse of discretion.

*Allen v. State*, 296 Ga. 785, 790 (7) (770 SE2d 824) (2015) (citation and punctuation omitted; emphasis supplied).

McCalop cites no cases, and we have found none, which stand for the proposition that an expert must have previously testified in Georgia in order to be qualified to testify or that an expert must be familiar with the law—as opposed to the science—related to his scientific opinion. Cf. *Perez v. State*, 309 Ga. 687, 695 (4) (848 SE2d 395) (2020) ("Unquestionably, the jury is to receive the law from the court, not from counsel." (citation and punctuated omitted)).

Accordingly, we conclude that the trial court did not abuse its broad discretion when it permitted Dr. Hamel to testify as an expert.

3. McCalop contends the trial court erred in allowing Dr. Hamel to testify that BPS had no scientific basis and that trial courts were wrong in providing jury instructions on BPS. This claim fails because McCalop failed to preserve any claim of error in this regard for ordinary appellate review and she fails to show plain error.

During direct examination, the prosecutor and Dr. Hamel had the following colloquy concerning BPS:

> Q:    So let me ask you this, then. Is [BPS] [a] recognized diagnosis in the [Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition ('DSM-5')][4]?
> A:    No.
> Q:    And in order for diagnosis to get to the DSM-5, what has to be done?
> A:    It has to be subjected to rigorous, scientifically approved [principles]. It has to be—for example, there has to be comparison group between women or men who have history of trauma and who have signs of battered person syndrome with those who come from similar background of trauma, but who don't have signs of [BPS].

---

[4] Dr. Loring testified that the DSM "is the diagnostic manual of the American Psychiatric Association."

21

And that way you can determine what—what is it about people who have [BPS] that distinguishes them from people who don't. So right now all we know is there is an association between what we call [BPS] and certain trauma histories.

But they vary so much in each case that the term 'battered person syndrome' almost doesn't really have any scientific meaning at this point.

Q: Okay.

A: That doesn't mean the symptoms don't exist and it doesn't mean people aren't battered and it doesn't mean that people who—who are battered don't—aren't affected in various ways. So that—

Q: Okay.

A: —that needs to be clear. Dr. Loring was not incorrect in pointing out that a number of people with batter—with history of being abused have these symptoms. Just that people vary so much from case to case that it's—it's—that the syndrome itself is very—has very weak support —

Q: Okay.

A: —the term 'syndrome.'

Q: The term 'syndrome' has weak support. But the people who are battered may have different elements of what Dr. Loring talked about yesterday.

A: That's correct.

Dr. Hamel further testified that McCalop "clearly [had] PTSD," but that "[t]he term [BPS] . . . is not accepted in the scientific community as a legitimate syndrome." During cross-examination, Dr. Hamel and McCalop's trial counsel had the following colloquy:

Q: And it sounds like pretty much your position is that you do not accept [BPS]. Correct?

A: I'm saying it doesn't have scientific support as a syndrome. It doesn't mean the symptoms don't exist.

Q: Right.

But it sounds as though what you're telling us is you don't believe we should even be talking about [BPS].

A: It would be better to talk about PTSD and the effects of PTSD. The two are kind of synonymous anyway and—

Q: Which two are synonymous?

A: PTSD and [BPS]. There's a lot of overlap. So I think PTSD since it's—it has more research support and it's in the DSM-5. It's a better term to use.

Q: Okay. But still my question is: It sounds like you're telling us that we should not even be talking about [BPS].

A: Well, you can talk about [BPS], yes. You can talk about people being battered. You can talk about people who are battered who also have symptoms of PTSD and other—and other behavioral signs that may speak to their actions at the time or their mindset at the time of the crime. That's . . . all perfectly within legal and scholarly bounds.

Q: That's not my question.

Should we be talking about [BPS], yes or no?

A: I would say no.

Q: No.

A: Even though it's used and discussed all—in different jurisdictions all over the country, so. . .

Q: Even though pretty much scholars have written about [BPS], correct?

A: Well, scholars—

Q: We shouldn't talk about it.

A: . . . scholars don't want it to be used. Battered advocates have been speaking out against the use of [BPS] for years—for many years.

Q: And even though courts give charges on [BPS] across this country daily, they shouldn't, correct?

A: Well, I wish to say that the courts haven't kept up with the research.

Q: So the courts are wrong?

A: . . . it's not up to me to decide.

Q: But I'm asking your opinion. It's your opinion . . . that the courts are wrong when they give jurors information, charges on [BPS]. Isn't that your opinion?

A: I do think that, yeah.

. . .

A: I'm—I want to—you know, I'm focusing on just the term 'battered person syndrome.' The problem is a syndrome – to have a syndrome, you have to have a pretty high level of scientific research and validity. And it just doesn't meet the criteria. That doesn't mean that the defense based on PTSD or the symptoms described is not useful. It is. I agree with Dr. Loring in most respects.

Q: Right.

But you disagree with Dr. Loring when she talks about []McCalop having [BPS] because you don't believe that [BPS] is a syndrome.

A: Right. It isn't.

Q: And you disagree with the majority of courts when they give direction on [BPS] because, in your opinion, it's not a syndrome.

A: Yes. I disagree.

Because McCalop did not contemporaneously object to any of the testimony that she complains of, this claim is reviewed only for plain error. See *Ellington v. State*, 314 Ga. 335, 343-344 (3) (877 SE2d 221) (2022). To establish plain error, McCalop "must point to

24

an error that was not affirmatively waived, and that error must have been clear and not open to reasonable dispute, must have affected [her] substantial rights, and must have seriously affected the fairness, integrity or public reputation of judicial proceedings." Id. at 344 (3) (citation and punctuation omitted). "The failure to meet one element of this test dooms a plain error claim." *Smith v. State*, 313 Ga. 584, 587 (872 SE2d 262) (2022) (citation and punctuation omitted).

We conclude that McCalop affirmatively waived any claim of error regarding Dr. Hamel's testimony that trial courts were wrong in providing jury instructions on BPS because McCalop's trial counsel invited this alleged error by asking several questions which elicited this testimony. See *Woodard v. State*, 296 Ga. 803, 810 (771 SE2d 362) (2015) (when the appellant "invited the error," he affirmatively waived appellate review of the error).

Regarding McCalop's contention that the trial court erred in permitting Dr. Hamel to testify that BPS had no scientific basis, although we have serious doubts that there was error, let alone an

25

error that was clear and obvious, we need not consider that question because McCalop has failed to satisfy the third prong of the plain-error test: that any "error must have affected the appellant's substantial rights, which in the ordinary case means [she] must demonstrate that it likely affected the outcome of the trial court proceedings." *State v. Johnson*, 305 Ga. 237, 240 (1) (824 SE2d 317) (2019).

Here, the trial court instructed the jury that McCalop had no burden of proof and the burden was on the State to negate or disprove any defense beyond a reasonable doubt. The trial court then instructed the jury as follows:

> [I]t is my duty and responsibility to determine the law that applies to this case and to instruct you on the law. You are bound by these instructions.

> It is your responsibility to determine the facts of the case from all of the evidence presented. Then you must apply the law I give to you in this charge to the facts as you, the jury, find the facts to be.

The trial court went on to instruct the jury on affirmative defense, justification, the use of force in defense of self, voluntary

26

manslaughter, and BPS. Regarding BPS, the trial court instructed the jury:

> I charge you that if you find from the evidence that the defendant suffers from battered person syndrome, you may consider that evidence in connection with the defendant's claim of self defense.
> Such evidence relates to the issue of the reasonableness of the defendant's belief that the use of force was immediately necessary even though no use of force against the defendant may have been, in fact, imminent.
>
> The standard is whether the circumstances were such that they would excite the fears of a reasonable person possessing the same or similar psychological and physical characteristics as the defendant and faced with the same circumstances surrounding the defendant at the time the defendant used force.

The trial court instructed the jury that it could consider evidence that McCalop suffered from BPS in connection with her self-defense claim, and "[q]ualified jurors under oath are presumed to follow the instructions of the trial court." *Park v. State*, 314 Ga. 733, 740 (1) (879 SE2d 400) (2022) (citation and punctuation omitted). Additionally, although Dr. Hamel testified that BPS did not have scientific support as a "syndrome," he also testified that

27

McCalop "clearly [had] PTSD" and that PTSD was his preferred scientific terminology when you speak about "people who are battered who . . . [have] behavioral signs that may speak to their actions at the time or their mindset at the time of the crime." Thus, we conclude that McCalop has failed to demonstrate that Dr. Hamel's testimony regarding BPS likely affected the outcome of the trial, and this claim fails.

4. McCalop contends that the State's prosecutor committed misconduct by arguing to the jury that BPS was not a recognized diagnosis or defense, but this claim has not been preserved for appellate review. During closing argument, the prosecutor stated: "So you have to look at this battered person syndrome, which is not—there's no empirical data. There's nothing that supports it. Right? But there is a law for it." McCalop did not object, and "we do not review unpreserved challenges to closing arguments in non-death penalty cases, even for plain error." *McIver v. State*, 314 Ga. 109, 152 (2) (g) (875 SE2d 810) (2022) (citation and punctuation omitted). Thus, this claim has been waived.

28

5. McCalop contends that the trial court erred in ruling that a defense witness "opened the door" to presenting evidence of McCalop's bad character. This contention also fails.

Kimberly McGhee, a friend of McCalop, testified that she witnessed injuries to McCalop when McCalop was dating Martin. During the prosecutor's cross-examination of McGhee, the following colloquy occurred:

> Q:    And you said at times you would hear the way that he would speak to her, right?
> A:    Yeah.
> Q:    Did you ever hear her speak back to him in any type of way?
> A:    I mean, she wasn't an aggressive type of person, you know. It was like—Sasha, she's a calm person. But it just seemed like with being around Michael, it just—I just didn't like his attitude around her and where he would be around us, it was a different thing. But phone calls— phone conversation, background, boom. You could hear how he talked to her and stuff.

The jury was excused, and the prosecutor argued that McGhee "opened up the door to a pertinent character trait of Ms. McCalop given the fact that she talked about her not being aggressive and even being a calm person." After hearing from counsel, the trial

29

court found that McGhee "seem[ed] pretty intelligent, very sharp" and "based on her demeanor in court and how she was—it was almost like she was just waiting to say that, to tell the jury [McCalop is] a calm person, she's not aggressive," particularly since "[t]here have been other witnesses out in the hallway who've been called [by McCalop] for just a purpose, you know, to talk about how violent Mr. Martin allegedly was." The trial court concluded that McGhee's statement "open[ed] the door to [evidence of McCalop's] character," was "intentional," and "not responsive to the State's question in the sense that the State was not goading her or trying to lead her down that path." The trial court then permitted the State, over McCalop's objection, to ask McGhee about several previous incidents. McGhee was then cross-examined as follows:

> Q:   Okay. Were you aware that back in April of 2012, a Pamela Britton, who Ms. McCalop was in a relationship with, alleges that Ms. McCalop got upset with her because she was in a car with another woman and set six pairs of jeans on fire?
> A:   No.
> Q:   Were you aware in October of 2012, that Pamela Britton, the same alleged girlfriend, and a Lamont Britton both alleged that Sasha got upset, was in a verbal

30

argument with Pamela, and threw a brick through a rear windshield vehicle?

A:   No, not aware of that.

Q:   And that also, she poured lighter fluid all over the outside of the house.

A:   No.

. . .

Q:   Were you aware . . . that allegedly in February of 2014, that she was at the Aquarius Lounge in Southwest Atlanta and that allegedly she was being disorderly and when officers from the Atlanta Police Department and security tried to get her out of the night club, she began pushing on them?

A:   I have no—I never even heard of that. I don't even know what club that is. Never heard of it.

Q:   Okay. Were you aware that in May of 2017, that Sasha is alleged to have slashed Mr. Mike Martin with a box cutter on both his neck and his arm? Were you aware of that?

A:   No.

Q:   Okay. Were you aware in October of 2017, that Sasha McCalop was alleged to have stabbed Mr. Martin in his leg with a knife?

A:   No.

Q:   Okay. Were you aware in November of 2017, Ms. Sasha McCalop was allegedly at a store in Southwest Atlanta and was stealing some items and when the loss prevention officers tried to grab her, she then hit the loss prevention officer?

. . .

A:   No.

Q:   Okay. And were you aware that on April 13th of 2018, . . . [i]t's alleged that while she was at the DeKalb County jail, that she allegedly got into a physical altercation with another inmate?

31

A: No.

Q: You weren't aware of any of those?

A: No.

Pretermitting whether the trial court erred in allowing the State to ask McGhee whether she was "aware" of eight aggressive acts allegedly committed by McCalop, we conclude that any error was harmless because it is highly probable that the error did not contribute to the verdict. See *Smith v. State*, 313 Ga. 584, 587 (872 SE2d 262) (2022) ("A nonconstitutional error is harmless if the State shows that it is highly probable that the error did not contribute to the verdict, an inquiry that involves consideration of the other evidence heard by the jury." (citation and punctuation omitted)). "In determining whether trial court error was harmless, we review the record de novo, and we weigh the evidence as we would expect reasonable jurors to have done so as opposed to viewing it all in the light most favorable to the jury's verdict." *Morrell v. State*, 313 Ga. 247, 261 (2) (c) (869 SE2d 447) (2022) (citation and punctuation omitted). "Even if the error admits improper evidence relevant to the case that is neither cumulative of other evidence nor beneficial to

32

the defense and goes uncorrected by the trial court, it may nevertheless be harmless in the context of the entire case." *Mack v. State*, 306 Ga. 607, 610 (3) (832 SE2d 415) (2019) (citation and punctuation omitted).

There was no dispute at trial that McCalop used a knife against Martin on January 17, 2018, and that they had at least four previous altercations. Two of those previous incidents involved Martin telling police that McCalop used a knife and box cutter against him, though McCalop testified at trial that she used those weapons defensively. The heart of this case was McCalop's state of mind at the time she last used a knife against Martin. While both experts agreed that McCalop had PTSD, they disagreed on whether PTSD explained McCalop's behavior on the night of the incident. And the jury had reason to be skeptical of McCalop's version of events since she repeatedly stated—to the police and at trial—that Martin's last statement was "F**k you, b**ch," but no such statement could be heard on the 911 recording, which appears to have lasted until Martin died.

33

Given the manner in which the cross-examination was conducted, the nature of the alleged incidents, including that some of the alleged incidents were cumulative, the failure of the State to mention the alleged incidents in closing argument, and the strong evidence of guilt, including the 911 call, that McCalop was found hiding in a nearby building, and her conflicting version of events, we conclude that any error was harmless. See *Williams v. State*, 313 Ga. 443, 450 (1) (870 SE2d 397) (2022) (OCGA § 24-4-404 (b) evidence erroneously admitted harmless in light of strong evidence of the defendant's guilt). See also *Parks v. State*, 300 Ga. 303, 307-308 (2) (794 SE2d 623) (2016) (holding that the erroneous admission of the defendant's aggravated assault conviction under OCGA § 24-4-404 (b) was harmless because there was substantial evidence that the defendant intentionally and maliciously killed the victim rather than acting in self-defense).

*Judgment affirmed. All the Justices concur.*

Decided May 2, 2023 — Reconsideration denied May 31, 2023.

Murder. DeKalb Superior Court. Before Judge Coursey, Senior Judge.

*J. M. Raffauf*, for appellant.

*Sherry Boston, District Attorney, Deborah D. Wellborn, Ashley C. O'Neal, Assistant District Attorney; Christopher M. Carr, Attorney General, Beth A. Burton, Deputy Attorney General, Paula K. Smith Senior Assistant Attorney General, Michael A. Oldham, Assistant Attorney General*, for appellee.