NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: October 15, 2025

S25A0454.  PROFET v. THE STATE.

PINSON, Justice.

Christopher Profet was convicted of malice murder, armed robbery, and other crimes related to the shooting death of Latonya Morris-Figg.[1] On appeal, he contends that the evidence was not sufficient to support his convictions and that the trial court erred by not

---

[1] Morris-Figg died on May 15, 2014. On January 30, 2015, a Fulton County grand jury returned an indictment charging Profet with malice murder (Count 1), felony murder (Counts 2 & 3), armed robbery (Count 4), aggravated assault (Count 5), and possession of a firearm during the commission of a felony (Count 6). After a jury trial from January 23 to 31, 2017, the jury found Profet guilty of all counts, and the trial court sentenced him to life in prison for malice murder (Count 1), a concurrent sentence of ten years in prison for armed robbery (Count 4), and a consecutive sentence of five years in prison for possession of a firearm during the commission of a felony. The remaining counts merged or were vacated by operation of law. Profet timely filed a motion for new trial on February 2, 2017, which was amended by new counsel on October 22, 2019. Profet waived a hearing on the motion for new trial, and the trial court denied the motion on April 22, 2022. Initially, Profet did not file a notice of appeal until July 11, 2022, and the appeal was dismissed as untimely. See *Profet v. State*, S23A0389 (Jan. 12, 2023). After the remittitur issued, Profet filed a consent motion to set-aside and reenter the order denying his motion for new trial because he had not received the order until June 15, 2022, after

securing an on-the-record waiver of his right to testify; not permitting him to develop a defense that the State did not properly investigate the murder; admitting expert testimony about shoe impressions; and allowing the jury to view "blown up" photos of shoe impressions during deliberations. He also contends that the cumulative effect of these errors warrants a new trial. For the reasons set out below, each claim fails and Profet's convictions and sentences are affirmed.

1. *Background*

The evidence at trial showed the following. On the morning of May 15, 2014, Profet was at the home of Devosha Newsom, with whom he had spent the previous night. Newsom testified that Profet left her home before 10 a.m. and told her he was going to a bank in Alabama to get some money. According to Newsom, Profet "always" carried a handgun on his hip, and she saw him with the gun when

---

the time to appeal had passed. The trial court vacated the earlier order and re-entered it on October 19, 2024. Profet timely filed a notice of appeal through new counsel. The appeal was docketed to the April 2025 term of court and submitted for a decision on the briefs.

he left her home that morning.

Profet then went to the home of Lequithia Burse. Burse testified that Profet was wearing an "Army PT-shirt," basketball shorts, and Nike flip-flops. Burse testified that she had seen Profet with several guns before — "a little bitty gun," a rifle, and a "black gun." He left her home around 10 or 10:30 a.m.

Profet got to Morris-Figg's home around 11 or 11:30 a.m., and Morris-Figg introduced him to Latalla Harris, her roommate, who had seen Profet before but had never met him. Profet and Morris-Figg had met at a party in January or February 2014, and Morris-Figg had told her roommate and other friends about Profet and showed them pictures of him. One of Morris-Figg's friends described Profet and Morris-Figg as "boyfriend and girlfriend" or "seeing one another."

Morris-Figg did not have to work that day, and she planned to buy a car that Profet had found for her. Morris-Figg told Harris that she had $1,200 worth of money orders that she wanted to cash because the seller would give her a discount on the car (which was

priced at $1,000) if she paid in cash. She also told two other friends that she planned to go with Profet to buy a car that day and told one of them that she needed to cash some money orders to pay for it. Morris-Figg then left the home with Profet and told Harris that she would return that evening.

Store surveillance footage obtained by the GBI and admitted at trial showed that Profet and Morris-Figg entered a Kroger store at 12:23 p.m. on May 15, 2014. Morris-Figg cashed some money orders there, and they left the store at 12:30 p.m. The video footage from Kroger showed Profet wearing a gray shirt, gray shorts, socks, and flip flops. Morris-Figg was wearing the same clothes later found on her body. Other surveillance footage obtained by the GBI and played at trial showed Morris-Figg and Profet enter a Wal-Mart store at 12:43 p.m. on May 15, 2014. The footage showed that Profet left the store at 12:49 p.m., Morris-Figg left at 12:51 p.m., and they drove away together at 12:52 p.m.

Around 3:15 p.m. on May 15, a man riding a four-wheeler with his grandson on Williams Road, a "dirt gravel road" in a "rural area"

4

of Fulton County, came across the body of a deceased woman and called 911. Local police officers and GBI agents arrived on scene soon after. The deceased woman was identified as Morris-Figg. The police did not find her purse, cell phone, cash, or money orders at the crime scene.

Based on Morris-Figg's autopsy, a GBI forensic pathologist determined that she died from gunshot wounds to her neck and head. A GBI firearms examiner received a bullet from Morris-Figg's autopsy and a cartridge case from the crime scene for analysis, which she determined were each consistent with having been fired by a Hi-Point .45-caliber automatic pistol. The man who found Morris-Figg's body had been carrying a .40-caliber handgun, which he gave to the police.

GBI agents photographed the crime scene. Morris-Figg's body had been found in a "muddy" area and there were a lot of shoe prints in the mud, so GBI agents documented the shoes of first responders and anyone else on scene, including the shoes of the man who found the body, for purposes of ascertaining whether any of the shoe prints

were not associated with the people who were known to have responded to the crime scene. Investigators also photographed tire impressions in the mud near where Morris-Figg's body was found.

Guillermo Rodriguez, a GBI footwear and tire impressions examiner, was tendered as an expert in that field without objection. Rodriguez explained that for footwear examination, he conducts a database search based on a questioned footwear impression, like one found at a crime scene. He uses lines or shapes he observes in the questioned impression to "tell the computer what to look for" and the computer returns "known samples that look similar to the questioned impression." Rodriguez performed this analysis using images of shoe prints from the crime scene. Examining shoe prints that did not belong to the people who responded to the crime scene, Rodriguez observed "herringbone lines," which are "kind of wavy" and "go across the questioned impression"; a Nike "swoosh" logo "in the middle of the impression"; and squares "around the edge of that impression." On another set of shoe prints that did not belong to any of the first responders, he observed horizontal lines at the top and diagonal

6

lines across the heel. Rodriguez used these descriptions to formulate a search query for the database and generate a report of the types of shoes that could have made those marks. As a result of the search, Rodriguez concluded that the shoe impressions at the crime scene were consistent with having been made by one of three possible models of Nike slides, but with the caveat that "there may be other shoes that are similar in tread design but are not included in the laboratory reference material," such as counterfeits or "knock-offs." Rodriguez testified that a full comparison could only be performed against a known shoe, but he never received a shoe for comparison.

While law enforcement investigated the crime scene at Williams Drive, Newsom — the woman with whom Profet had spent the night before — was driving home, passed the daycare that Profet's daughter attended, and saw his daughter sitting outside with a teacher. It was around 3:30 p.m., and Newsom tried to call Profet, but he did not answer his phone. Newsom "was mad" that Profet had not picked his daughter up from daycare as he usually did. So when Newsom could not reach Profet, she took his daughter to Newsom's

7

mother's apartment, where Newsom's own children were.

Newsom testified that Profet later "pulled up to [her] mom's apartment building like really frantic and sweaty." Newsom said Profet was wearing an "Army gray shirt" and it was wet "on the neck and under the armpits." He also wore gray "sweat shorts" and black Nike flip flops. Newsom did not notice if he still had the gun she had seen him with that morning.

Profet told Newsom he had been at the gym. Later, Profet told GBI Agent Rocky Bigham that he went to the gym *after* he picked up his daughter on May 15. When asked what gym he went to, he named the Atlanta Fitness in Newnan, but neither Newnan location of Atlanta Fitness had any record of him being there on May 15.

The next day, May 16, Profet told Newsom that he was able to get some money together to go on a trip with her, even though he had told her before that he did not have the money. But Newsom was still mad at Profet because he had not picked up his daughter from daycare the day before, so she went on the trip without him. After she returned home, Profet gave her a debit card with his name

on it and told her to use it if she "needed something." He also called and asked if she had seen his flip-flops. She looked for them but did not find them.

Also on May 16, Agent Bigham spoke with Harris, who had gone to the police when Morris-Figg did not return home on May 15 or come to work on May 16, and with Morris-Figg's best friend, Cecilia Leon. Harris and Leon only knew Profet by his first name, so it took a few days for Agent Bigham to identify Profet as the person with whom Morris-Figg had left her home on May 15. Agent Bigham then called Profet and spoke with him for the first time on May 20, five days after Morris-Figg's body was found. At that time, Profet was visiting his grandmother in Baton Rouge, Louisiana. Profet said Morris-Figg was a friend of his uncle's and that he had last seen her on either May 14 or 15. He said he had taken Morris-Figg to "different locations to cash money orders" and then dropped her off at an apartment complex in Fairburn, Georgia around 1 or 1:15 p.m. Profet also said that Morris-Figg had $800 or $900 in cash and that they had stopped at a gas station before going to the apartment complex,

9

where she paid for gas in cash. Investigators could not corroborate Profet's statement about the gas station. And given that the surveillance footage obtained by the GBI showed Profet and Morris-Figg leaving the Wal-Mart in Snellville at 12:52 p.m., it would have been impossible for him to have dropped her off at the apartment complex in Fairburn by 1:15 p.m. because it was at least a 45-minute drive from the Wal-Mart.

Later on May 20, Profet called Agent Bigham and said he was concerned that he would be arrested if he came back to Georgia. He also told Agent Bigham, for the first time, that he had a sexual relationship with Morris-Figg. He said he had not told Agent Bigham about their relationship earlier because he was around his grandmother and did not want her to hear. Profet told Agent Bigham that he and Morris-Figg had sexual intercourse "a couple of times" and had oral sex in the week before her death. But DNA evidence col-

lected from Morris-Figg's body during the autopsy showed the presence of Profet's DNA in Morris-Figg's vagina.[2]

Agent Bigham spoke to Profet again on May 27. This time, Profet said that after he dropped off Morris-Figg, he went to Burse's home and had sex with her. When Agent Bigham first spoke to Burse, she said Profet had been with her at 1:00 p.m. on May 15. But at trial, Burse testified that she had lied to Agent Bigham, and that she and Profet had sex that morning, that he left around 10 or 10:30 a.m., and she did not see him again until he came back from Louisiana. Burse further testified that, when Profet returned from Louisiana, he told her he had been away because someone was "trying to say he killed somebody." He told her that he was going to tell the police that he was with Burse until 1:00 p.m. on May 15. When they spoke about this, Profet took Burse's phone apart because he thought GBI agents were listening, then put it back together after the conversation ended. During her testimony, Burse clarified that

---

[2] The expert witness who testified about the DNA explained that a "full male DNA profile," like the one collected here, can be obtained from vaginal swabs taken up to 72 hours after sexual intercourse.

Profet did not ask her to tell the police he was with her at 1 p.m., only that he was going to tell the police that because he did not remember where he was.

When Profet was asked during the May 27 interview what he had been wearing on May 15, he answered that he had been wearing a gray shirt and shorts with Jordan sneakers or Polo Ralph Lauren flip-flops. The surveillance footage from Kroger showed that he was wearing flip-flops, and both Burse and Newsom said that on May 15 they saw Profet wearing Nike flip-flops along with the same gray T-shirt and shorts shown in the surveillance footage. Investigators never found Profet's flip flops or the clothes he wore on May 15.

Profet also consented to a search of his home and car on May 27. Agent Bigham photographed the tires on Profet's truck because there were tire impressions at the crime scene. Rodriguez, the GBI footwear and tire impression examiner, compared the tire impressions from the crime scene with the images of the tires on Profet's truck and concluded the tire impressions from the crime scene were not made by any of the tires on Profet's truck.

Profet's grandmother, whom Profet had visited in Baton Rouge after Morris-Figg's death, told Agent Bigham that Profet had one or more tires replaced while there because of a "spill on the interstate." She also said Profet wore flip-flops when he visited her. But when Profet's grandmother testified at trial, she denied telling Agent Bigham about the tires or the flip-flops. She said she had been taking pain medicine at the time of her interview with Agent Bigham, which had her "off balance."

Guns were found in Profet's home, but none were a .45-caliber, the type of gun used to shoot Morris-Figg. When asked about the flip-flops, Profet said he thought his child's mother had taken them when she picked up their daughter the prior weekend. Agent Bigham spoke with the mother of Profet's child, and she said she had not taken the shoes and had already told Profet as much when he called to ask.

Agent Bigham also obtained phone records for Morris-Figg, which showed that she and Profet had communicated more than 200 times from February to May 2014. But Profet did not try to call or

text Morris-Figg after May 15.

Agent Bigham also spoke to Morris-Figg's estranged husband, who lived in California. Morris-Figg sometimes spoke to Harris about her estranged husband and her ex-husband, both of whom Harris understood to live in California. Morris-Figg had told Harris that her ex-husband "was locked up." Leon, Morris-Figg's best friend, testified that she had met Morris-Figg's estranged husband before, but that they "broke up" sometime before 2008. Leon testified that, as far as she knew, Morris-Figg's husband lived in California. Leon picked him up from his cousin's home when he flew to Atlanta after Morris-Figg's death.

2. *Sufficiency of the Evidence*

Profet contends that the evidence was not sufficient as a matter of constitutional due process or Georgia statutory law to sustain his convictions. When reviewing the sufficiency of the evidence as a matter of constitutional due process, we view the evidence presented in the light most favorable to the verdicts and ask whether a rational

trier of fact could have found the defendant guilty beyond a reasonable doubt. See *Jackson v. Virginia*, 443 US 307, 319 (1979). Questions about the weight and credibility of evidence, the inferences to be drawn from it, and the resolution of any conflicts in the evidence are left to the jury. See *Anderson v. State*, 319 Ga. 56, 59 (2024). When a conviction is based entirely on circumstantial evidence, as it was here, the State must present sufficient evidence to "exclude every other reasonable hypothesis save that of the guilt of the accused." OCGA § 24-14-6. "Whether an alternative hypothesis is reasonable, and whether the circumstantial evidence excludes any such hypotheses, are questions for the jury, and we will not disturb the jury's findings unless they are insupportable as a matter of law." *Lee v. State*, __ Ga. __, 917 SE2d 683, 694 (2025) (cleaned up).

In the opening paragraph of the section of his brief devoted to his sufficiency claim, Profet lists his convictions for malice murder, possession of a firearm during the commission of a felony, and armed robbery. But Profet fails to offer any argument at all as to why the evidence was not sufficient to authorize his convictions for malice

15

murder or possession of a firearm during the commission of a felony, so those claims are deemed abandoned. See Ga. Sup. Ct. R. 22 ("Any enumerated error or subpart of an enumerated error not supported by argument, citations to authority, and citations to the record shall be deemed abandoned."); *Byrd v. State*, 321 Ga. 222, 225 (2025) ("[L]itigants must do more than just make an argument or cite authority, but must now ensure that argument, citation to authority, and citation to the record are all present to avoid having an enumeration deemed abandoned.").

Profet offers two sentences of specific argument in support of his claim that the evidence was not sufficient to sustain his armed robbery conviction: He contends that there was no evidence that money was taken from Morris-Figg, and that she could have used her money to buy a car as planned. But viewed in the light most favorable to the verdict, the evidence was sufficient as a matter of constitutional due process to authorize the jury to find that Profet took the money from Morris-Figg, and it was sufficient under OCGA § 24-14-6 to exclude as unreasonable the hypothesis that she

16

instead used the money to buy a car. The evidence showed that Morris-Figg cashed $1,200 in money orders while she was with Profet on May 15. She told several friends that Profet was taking her to buy a car that day, which is why she needed cash. But there was no evidence that she bought a car that day, and when her body was found, investigators did not find a purse, wallet, or any cash or money orders on or near her body. And on the day after she was killed, Profet suddenly had the money to go on a trip with Newsom — money he had not had before. So the jury reasonably could have inferred that Profet took Morris-Figg's money and that she did not use the cash to buy a car. So Profet's remaining sufficiency claim fails.

3. Profet contends that his due process rights were violated when the trial court failed to allow him to testify at trial or procure a constitutional waiver of that right. Even assuming this claim was preserved for appeal, see *Jones v. State*, 319 Ga. 140, 144 n.2 (2024), it fails. A criminal defendant's decision whether to testify is "considered a tactical decision to be made by the defendant himself after

consultation with his trial counsel and there is no general requirement that a trial court interject itself into that decision-making process." Id. at 145 (quotation marks omitted). Trial courts are not required to "advise a defendant of the right to testify or to ascertain on the record whether the defendant's waiver of that right is voluntary, knowing, and intentional." Id. (quotation marks omitted). Nor must they secure an on-the-record waiver of the right to testify, although we have said that doing so is "the better practice." Id. (quotation marks omitted).[3] So the trial court did not err by failing to make that inquiry here. Id.

4. Profet claims that the trial court erred when it did not permit him to "develop the defense of failure of the State to properly inves-

---

[3] Although Profet cites *Johnson v. Zerbst*, 304 US 458, 464 (1938) for the proposition that a waiver of a "fundamental right" requires the personal consent of the defendant and cannot be inferred from a silent record, *Johnson* involved the waiver of the right to counsel, not the right to testify. And to the extent Profet suggests that this Court should create a new rule requiring an on-the-record waiver of the right to testify, he does not engage in the type of stare decisis analysis that overruling *Jones* would require, and we decline to do so. See, e.g., *Wasserman v. Franklin County*, 320 Ga. 624, 645–47 (setting out principles of stare decisis).

18

tigate the murder case." He argues that a defendant can cross-examine a witness to elicit relevant evidence that someone else committed the crime, "even if it may sometimes be hearsay." He does not discuss in his brief what evidence was excluded but includes a string of record citations in a parenthetical after the heading of this claim. But none of the cited pages include a ruling by the trial court, and Profet has not otherwise identified what evidentiary ruling or rulings he is challenging on appeal. Because he has failed to identify a ruling for this Court to review, this claim is deemed abandoned. See Ga. Sup. Ct. R. 22; *Byrd*, 321 Ga. at 225. See also *Pierce v. State*, 319 Ga. 846, 855 (2024) ("Because Appellant has not specifically identified the objectionable testimony, has not included any meaningful legal analysis, and simply makes vague assertions of error and cites to chunks of the transcript, he is not entitled to review of this claim." (cleaned up)).

5. Profet contends that the trial court erred in allowing Rodriguez to testify about shoe impressions and shoe type because he was

not properly qualified as an expert under the *Daubert*[4] standard. Because Profet did not object to Rodriguez's qualifications at trial, this claim is reviewed only for plain error. See OCGA § 24-1-103(d); *McCalop v. State*, 316 Ga. 363, 372, 375 (2023) (reviewing for plain error a defendant's contention that the trial court erred in allowing a witness to give an expert opinion that had no scientific basis because the defendant did not contemporaneously object to the challenged testimony).

"To establish plain error, a defendant must show that an error occurred, was not affirmatively waived, was clear and obvious beyond reasonable dispute, and affected his substantial rights." *Burke v. State*, 320 Ga. 706, 706 (2025). "If that showing is made, then we consider whether the error seriously affected the fairness, integrity, or public reputation of judicial proceedings." Id. (internal quotation marks omitted).

---

[4] See *Daubert v. Merrell Dow Pharms.*, 509 US 579 (1993). Under that standard, "the trial court acts as a gatekeeper, assessing both the witness' qualifications to testify in a particular area of expertise and the relevancy and reliability of the proffered testimony." See *Garrison v. State*, 319 Ga. 711, 726 (2024) (internal quotation marks omitted).

20

For purposes of plain error review, we consider whether an error was "plain" by looking to the "law at the time of appellate review rather than at trial." See *State v. Herrera-Bustamante*, 304 Ga. 259, 264 (2018). This timing rule is a species of the long established "general rule … that an appellate court must apply the law in effect at the time it renders its decision." *Henderson v. United States*, 568 U.S. 266, 271 (2013) (citing *United States v. Schooner Peggy*, 1 Cranch 103, 110 (1801)) (applying Rule 52(b) of the Federal Rules of Criminal Procedure).[5] This plain-error version of that general rule is often applied when the difference between the law at trial and the

---

[5] Code section 24-1-103(d), which authorizes plain error review of unobjected-to evidentiary rulings, was "borrowed from the Federal Rules of Evidence," so we "look to decisions of the federal appeals courts construing and applying the Federal Rules." *Gates v. State*, 298 Ga. 324, 326–27 (2016) (internal quotation marks omitted). And at the time the current Evidence Code was enacted, we had already "adopted the federal plain-error standard, articulated by the United States Supreme Court" for plain error review of unobjected-to jury instructions, see OCGA § 17-8-58(b). *Gates*, 298 Ga. at 326 (citing *State v. Kelly*, 290 Ga. 29, 33 (2011) (noting that "the federal [plain error] standard derives from Federal Rule of Criminal Procedure 52(b)" and that "OCGA § 17-8-58(b) adopts Rule 52(b)'s language almost verbatim."). Moreover, the language of OCGA § 24-1-103(d) and OCGA § 17-8-58(b) is substantially the same, as is the language of Federal Rule of Evidence 103(d) and Federal Rule of Criminal Procedure 52(b), so we adopted the same plain-error standard articulated in *Kelly* to assess plain error under OCGA § 24-1-103(d). See *Gates*, 298 Ga. at 327.

law on appellate review is the result of an intervening judicial decision. Such a decision may settle an unsettled question about how to interpret a particular statute, or it may correct an incorrect interpretation of a statute. See *Lyman v. State*, 301 Ga. 312, 318 (2017). Either way, such a decision has not "changed" what the statute meant as compared to the time of trial, but instead "is explaining [our] understanding of what the statute has meant continuously since the date when it became law." *Rivers v. Roadway Exp., Inc.*, 511 U.S. 298, 313 n.12 (1994). In other words, "[a] judicial construction of a statute is an authoritative statement of what the statute meant before as well as after the decision of the case giving rise to that construction." Id. at 312–13. And so it makes sense in assessing a claim of plain error to apply the current, authoritative construction of the statute — the law at the time of appeal — rather than a discarded interpretation that we have concluded does *not* reflect the law.

The same timing rule applies when the difference in law between the time of the trial and the appeal is the result of legislative

22

action. But in such cases, application of the rule looks different. When our legislature enacts or amends (or repeals) a statute, the legislature has "the power to decide when the statute will become effective." Id. at 312–13, 313 n.12. When the legislature chooses an effective date, that choice necessarily informs what the law is at the time of an appeal. See, e.g., *Anthony v. Penn,* 212 Ga. 292, 293 (1956) ("Unless a statute, either expressly or by necessary implication, shows that the General Assembly intended that it operate retroactively, it will be given only prospective application."). If, for instance, the legislature makes clear that a statute applies only to proceedings commenced after the law's effective date, the legislature has told us that "the law at the time of appeal" is that the new law applies only *after* its effective date, and so the old law applies before that date. See id.[6]

Just so here. At the time of this appeal, OCGA § 24-7-702 sets

---

[6] The General Assembly's power to enact laws that apply retroactively is limited. See Ga. Const. Art. I, Sec. 1, Par. X. See e.g., *Southern States Chemical Inc. v Tampa Tank*, 316 Ga. 701, 707–08 (2023).

out the standards governing the qualification of experts and the admissibility of expert testimony which, by that statute's terms, are intended to implement the *Daubert* standard. See OCGA § 24-7-702(f). But the Act that amended the Code to adopt that standard made clear that it applies only prospectively, declaring that "This Act shall become effective on July 1, 2022, and shall apply to any motion made or hearing or trial commenced on or after that date." See Ga. L. 2022, p. 201 §§ 1, 3. Thus, the law at the time of this appeal is that the statutory *Daubert* standard does not apply to motions made or hearings or trials commenced before July 1, 2022. And Profet was tried in 2017, well before that effective date. As a result, the then-effective OCGA § 24-7-707 and the corresponding *Harper*[7] standard applies. See also *Nundra v. State*, 316 Ga. 1, 14-16 (2023) (determining whether error was plain based on former Rule 707, the evidentiary rule applicable at trial, even though that rule had been

---

[7] See *Harper v. State*, 249 Ga. 519 (1982). Under that standard, a trial court is required to assess "whether the procedure or technique in question had reached a scientific stage of verifiable certainty, or as one professor put it, whether the procedure rested upon the laws of nature." See *Garrison*, 319 Ga. at 726 (cleaned up).

repealed by the time of appellate review, see Ga. L. 2022, p. 201 §§ 1, 3).

Thus, we consider here whether the alleged evidentiary error was plain under former Rule 707, which applied at Profet's trial, and not Rule 702(f), which made the *Daubert* standard applicable to criminal trials effective July 1, 2022. See Ga. L. 2022, p. 201 §§ 1, 3. In a case to which that former standard applied, we have explained that "the comparison of shoeprints to the external physical characteristics of particular shoes is not a matter of scientific principle or technique," so a trial court was not required to apply the standard for expert testimony to admit such evidence, and the witness could offer lay testimony on the subject. *Belton v. State*, 270 Ga. 671, 673–74 (1999) (trial court did not err in admitting witness as expert in shoe impressions without conducting the proper analysis because expert testimony was not required on the subject). See also *Robinson v. State*, 309 Ga. 729, 735 & n.2 (2020) (noting that former OCGA § 24-7-707, which applied at Profet's trial, was "nearly identical" to OCGA § 24-9-67, the section of the old Evidence Code at issue in

25

*Belton*). Given this precedent, Profet has not shown that the trial court committed a clear and obvious error in allowing Rodriguez to testify about his observations of the shoe impressions and his conclusions that the impressions were consistent with three types of Nike slides. See *Belton,* 270 Ga. at 673–74. Thus, Profet cannot show plain error and this claim fails. See *Burke,* 320 Ga. at 706.

6. Profet contends that the trial court erred in allowing the jury, during deliberations, to view "blown-up" photos of shoe prints from the crime scene because doing so violated the continuing-witness rule. The photo at issue was tendered and admitted as evidence during the testimony of Rodriguez, the GBI footwear and tire impressions examiner. During deliberations, the jury sent a note to the court asking to view this photo, and on further inquiry, the foreperson indicated that the jury could not find the photo in the box of evidence sent back with the jury. The foreperson also represented that the photos the jury had copies of were not as clear as the copies that had been displayed on the courtroom monitors during trial. After some time, the jurors asked if they could see some of the photos

26

on a CD. Profet argued that allowing the jury to view the enlarged images would violate the continuing-witness rule, but the trial court ruled that the jurors could view the image in the courtroom. The jurors viewed the photo in the courtroom, then returned to the jury room to continue deliberations.

To "avoid placing undue emphasis on written testimony," the continuing-witness rule prohibits written statements from going back with the jury "to be read and reread during its deliberations" and instead treats written evidence "like oral testimony that the jury hears only once from a witness." *Roberts v. State*, 282 Ga. 548, 552 (2007) (citation and punctuation omitted).[8] The continuing-witness rule does not apply to photographs, which are "not written testimony and d[o] not derive their evidentiary value solely from the credibility of their makers." *Davis v. State*, 285 Ga. 343, 348 (2009). So the rule did not apply to the photo here. See id.

7. Finally, Profet contends that a new trial is warranted based

---

[8] The enactment of the current Evidence Code did not affect the continuing-witness rule. See *Rainwater v. State*, 300 Ga. 800, 802 n.3 (2017).

on the cumulative effect of the errors the trial court committed by allowing Rodriguez to testify as an expert about the shoe prints and permitting the jury to look at the photo of the shoe prints during deliberations. But because we concluded above that those claims of error failed, there are no errors to assess cumulatively, and so this claim fails, too. See *Moore v. State*, 315 Ga. 263, 270 n.3 (2022) ("Assessing cumulative prejudice is necessary only when multiple errors have been shown." (internal quotation marks omitted)).

*Judgment affirmed. All the Justices concur.*